(22 App. Div. 33.)

ELLIS v. MILLER et al.

(Supreme Court, Appellate Division, First Department. November 12, 1897.)

CONSTRUCTION OF CONTRACT.

Plaintiff and defendant entered into an agreement providing, in substance, that whenever purchases and sales were made between the parties for the next five years should be upon certain expressed terms, but nothing was said as to any particular quantities to be sold or purchased. *Held*, per Van Brunt, P. J., and O'Brien, J., that the agreement implied no covenant by either party either to buy or to sell.

Patterson and Williams, JJ., dissenting.

Appeal from trial term.

Action by Herman Ellis against Leopold Miller and others. From a judgment entered on a verdict directed by the court, defendants appeal. Affirmed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

M. S. Guiterman, for appellants.
Theron G. Strong, for respondent.

O'BRIEN, J. In disposing of the second counterclaim, the learned trial judge said:

"These people had been doing business for some years. It does not appear that during that period there was any understanding or agreement covering

any particular period, or that any particular amount of goods should be pur- chased. The defendants did purchase a large quantity of goods from the plaintiff, but there was no obligation at any time prior to the commence- ment of this agreement to buy any at all. Now, the period arrived in the course of their business transactions when they thought they ought to have a little more definite understanding as to terms, whereupon they entered into this agreement, which, as far as appears on the face of it, provided that when they did buy goods during the next five years it should be under these conditions and upon these terms. There had not been any obligation before this to buy any particular amount. There had not been any obligation on the part of the plaintiff to sell any particular amount, or any at all. * * * It could have been very easily stated, if there had been any desire on the part of the parties to impose an obligation to sell or an obligation to buy."

Considering the language of the agreement itself, we think that this construction was not only correct, but is enforced by the course of dealing between the parties. The agreement covers only the terms of sale of such cigarettes as the plaintiff might sell and the defendants might buy, and does not create or purport to be an obligation of the plaintiff to sell or of the defendants to buy any cigarettes whatever. The obvious meaning of the language employed was that, whatever purchases and sales were made by the parties during the ensuing five years should be on the terms expressed in the agreement, and that, in consideration of such terms, the defendant agreed not to push the sale of any other cigarettes made of bright tobaccos, or to offer Re- cruit cigarettes for less than the stipulated price. It would be going a long way to import into such an agreement implied covenants on the part, first, of the plaintiff to sell, and, secondly, of the defendants to buy, any specified amount of cigarettes; and yet, as there are no express covenants to that effect, such must necessarily be implied, if the contract is to be regarded as sufficiently definite to be enforceable.

The case of Baker Transfer Co. v. Merchants' Refrigerating & Ice Manuf'g Co., 1 App. Div. 507, 37 N. Y. Supp. 276, relied upon by the appellants, is entirely different. That was "an action brought to re- cover damages for the breach of a written agreement under seal which stated, in substance, that the defendant was engaged in the manufacture of ice, and would have an output of from 75 to 100 tons per day; and that the intention was to dispose of this ice, and to de- liver the same to various customers, and provided that the plaintiff should during the term of two years take the ice from the defendant's plant, and deliver it to the customers; that the plaintiff should pro- vide a large number of horses and wagons for delivery; that, if the plaintiff did not deliver promptly, the defendant might, after notice to the plaintiff of such default on his part, do so, and might charge the plaintiff with the cost of so doing; that the plaintiff should receive for delivery a certain sum per ton, and that the defendant might, after the expiration of one year, purchase the plaintiff's horses and delivery wagons,—which did not contain any promise upon the part of the de- fendant that it would furnish to the plaintiff the ice which was to be delivered to the customers." And it was held "that, in order to reach a result which the unequivocal acts of the parties indicated that they intended to effect, the court would imply a covenant on the part of the defendant to furnish the ice for the purpose of carrying out such intentions." It will be noticed that in the contract itself there con-

sidered there was a certain and assured basis for the implication, both with respect to the goods themselves and the quantities. Here there is an absence of any specific quantity to be sold or purchased on which to base an implication to that effect. The defendants here seek damages for loss of profits between certain dates covered by the written agreement, founded on the refusal of the plaintiff to sell the cigarettes. But, as the agreement does not obligate the plaintiff to sell or the defendants to purchase, it is difficult to see upon what theory an action for damages would lie, or, if it would lie, upon what basis there could be a computation of such damages.

We think, therefore, that the disposition made of the case below was right, and that the judgment should be affirmed, with costs.

VAN BRUNT, P. J., concurs.

INGRAHAM, J. The second counterclaim set up in the answer alleges "that the plaintiff has, since about March 4, 1894, and before the commencement of this action, refused and omitted to perform the said contract on his part, and still refuses to perform the same, and prior to the commencement of this action gave notice to the defendants of his intention not to perform the same in the future," and it is for this breach of the contract that the defendants demand a judgment for damages. The only evidence to prove this breach of the contract is two letters from the defendants; one dated Baltimore, March 4, 1895, by which the plaintiff notified the defendants that he had "this day sold and transferred all our business brands and good will to the American Tobacco Company, who will hereafter manufacture and sell the goods heretofore manufactured by us, as our successor. Kindly, in the future, send all orders for our goods to the American Tobacco Company at their office, No. 507 W. 22nd St., in New York City." I do not think that this can be said to be a notice to the defendants that the plaintiff would refuse to perform his contract. He notified the defendants that he had assigned his business to the American Tobacco Company, who would manufacture and sell the goods theretofore manufactured by him, with a request to order goods in the future from that corporation. There was no explicit declaration that the plaintiff would not furnish the goods that his contract called upon him to furnish in the event of the corporation's declining to perform the contract. It was rather a request to the defendants to in the future purchase the goods from the corporation to whom the plaintiff's business had been transferred, with a notice to defendants that the goods that plaintiff was entitled to demand would be furnished by the transferee; and in the defendants' version of the interview which followed the receipt of this letter, it was assumed that the contract was binding. The plaintiff then asked the defendants to release him (the plaintiff) from the contract, and offered for such release the sum of $1,000. There was nothing in this interview to justify a finding that the plaintiff refused to abide by the contract, or to furnish the defendants such goods as were necessary to enable them to perform the contract on their part. Nor do I think that the other correspondence is evidence of a breach of the contract. In the

letter of March 23, 1895, which appears to have been the last letter written by the plaintiff, the plaintiff again notifies the defendants that the American Tobacco Company had purchased his business, and that they (the defendants) could apply in the future for all goods manufactured by him to the American Tobacco Company, who would furnish them terms upon application.     There is no explicit declaration here that the plaintiff would not furnish the defendants any goods, and nothing to justify a finding that the contract had been broken by the plaintiff, or that he had expressly notified the defendants that he would refuse to perform the contract.     The contract itself did not require the plaintiff to furnish the defendants any particular amount of goods at any particular time.     In fact, the only obligation of the plaintiff to the defendants was implied from the provisions of the contract; and, before such an obligation could exist, the defendants must order goods from the plaintiff, specifying what they required. No such order was ever given.     No demand was made upon the plaintiff to comply with his contract, or to furnish any goods; but, on the contrary, the defendants simply refused to pay for goods which had been delivered, and for which they were clearly liable.     There could be no breach of this contract by the plaintiff until the defendants had ordered the goods under the contract; and, while a plain declaration on the part of the plaintiff that he would refuse to deliver any goods thereafter would excuse a failure of the defendants to demand the delivery of the goods to them, in the absence of such a plain declaration it seems to me that there was no breach of the contract until an order should be given by the defendants, to the plaintiff, or a demand made upon him for goods, which, under his contract, he was bound to furnish.     This question does not seem to have been passed upon by the court below.     The court. on dismissing the complaint, said that, "assuming that the plaintiff refused to sell any more goods, and committed a breach of this agreement as far as it was possible for him to do, the counterclaim does not set forth a cause of action."     I agree with Mr. Justice PATTERSON that the court erred in that construction of the contract; but, to entitle the defendants to recover upon their counterclaim, they were bound to prove a breach of the contract by the plaintiff; and I do not think that there was evidence sufficient to sustain a finding of such a breach by the plaintiff.

I think the judgment should be affirmed.

PATTERSON, J. (dissenting).     This was an action to recover the value of goods sold and delivered by the plaintiff to the defendants. The cause of action set forth in the complaint was admitted in the answer, but the defendants sought to recover upon two counterclaims. On the trial, the justice presiding, after hearing some evidence offered to establish those counterclaims, held, upon giving construction to the written instrument under which the defendants claimed, that as matter of law no recovery could be had by the defendants, and he thereupon stopped the trial, dismissed the counterclaims, and directed a verdict for the plaintiff.     From the judgment entered upon that verdict this appeal is taken.     The counterclaims referred to arose under

the terms of a written instrument signed by both the plaintiff and the defendants, which is in the words and figures following:

"This agreement, made this 18th day of September, one thousand eight hundred and ninety-four, between H. Ellis & Company, of Baltimore, Maryland, parties of the first part, and Leopold Miller & Sons, of New York, parties of the second part, witnesseth: That the parties of the first part are to make an allowance to the parties of the second part of one thousand dollars per annum, said amount to be deducted in equal monthly installments ($83.33) from current billls. Parties of the first part also bind themselves to make a further allowance of two (2%) per cent. below the price given to any other house in the states of New York and New Jersey on the Recruit cigarettes. In consideration of the above, the parties of the second part also bind themselves not to push any nickel packages of all tobacco cigarettes made of bright tobaccos, and they further bind themselves not to sell or offer for sale, directly or indirectly, the said Recruit cigarette for less than $3.60, less 2 per cent., per thousand. And they also agree to push and do all in their power to increase the sale of the said Recruit cigarettes. This agreement to remain in force from five years from the above date. H. Ellis & Co.
"Leopold Miller & Sons.

"Witness: Abraham De Lemos."

It was claimed and proved by the defendants that they and the plaintiff carried on business for some five months or more under the arrangement provided for by the instrument above set forth, but in March, 1895, the plaintiff refused to comply further with the terms of the instrument, or to be bound by it. The first counterclaim was for the proportionate share of the allowance of $1,000 a year provided for in the contract, and the second for damages arising from the plaintiff's refusal to further perform the contract, and from his violation of the same, by placing himself in a position (as the proof showed) by which he willfully disabled himself from further performing it. He had sold out all his business to the American Tobacco Company, with which the defendants had not contracted, and against which they could make no claim or demand on this contract. The justice at the trial term held that the contract was one relating altogether to future dealings between the parties; that it bound neither the plaintiff nor the defendants to any specific duty or obligation; that there was nothing in its terms requiring the plaintiff to sell, nor the defendants to buy, any amount of goods, nor, indeed, to trade with each other at all; but that it simply stipulated for what should be allowed the defendants in case they did buy from the plaintiff. The contract must be construed in the light of surrounding circumstances, and in view of the situation of the parties as to its subject-matter (Griffiths v. Hardenbergh, 41 N. Y. 464; In re New York Cent. R. Co., 49 N. Y. 419), and, so construing it, we ascertain from such evidence as the defendants were allowed to give that the instrument was not a mere contract exclusively pertaining to the prices of goods that might be bought, but it related to a current business between the parties, which had been continuous for a long time, and which it was assumed would continue for five years more, and which it was the fixed purpose of both parties to have continue, but only upon terms more definite and precise than had theretofore been agreed upon. If the agreement were simply one for purchase and sale of goods, and nothing further were embraced in it, the construction given by the court

below might be sustained; but it is a contract for the regulation of a business established between the parties to it, and that business consisted, in an important part, of the defendants' marketing the plaintiff's manufactures. The plaintiff was looking to an increased market for his goods through the instrumentality of the defendants, by giving to them concessions and considerations to induce them to apply all their efforts to the sale of the plaintiff's manufactures in preference to those of other makers of similar goods. In consideration of the defendants' undertaking, the plaintiff agreed to give certain advantages to them, and the defendants specifically agreed, in so many words, to do all in their power to increase the sale of the plaintiff's manufacture during the period of five years. The benefit to the plaintiff is obvious. The consideration for the plaintiff's promise is clear, for it is elementary that a sufficient consideration for such a promise is the assumption of any obligation, charge, or inconvenience that a promisee may assume at the express or implied request of a promisor. Notwithstanding the untimely termination of the trial, there is enough before us to show the situation of the parties. The plaintiff had been a small manufacturer of cigarettes. The defendants were among the largest firms of tobacco merchants in the United States. They had large facilities for selling cigarettes, and about the year 1889 they began to buy and sell goods manufactured by the plaintiff. Between that year and 1894, they sold on an average over three millions and a half of the plaintiff's cigarettes every year. They had thus marketed many of the plaintiff's goods. They advertised the brands, sent out price lists and cards and circulars, gave samples to their salesmen, showed the goods in store, and did all they could to promote sales. It is true, this was done also for their own benefit, and there was no technical relation of agency in the matter; but it was with direct reference to the continuation of this dealing, which resulted in putting upon the market large quantities of the plaintiff's goods, that a written contract was made. It was agreed that it should continue for five years from its date. It bound the defendants to the active duty of pushing the plaintiff's wares, and endeavoring to increase the sale of them, for the performance of which duty they were to be paid the sum of $1,000 a year. That such payment was to be made by monthly installments and deductions from current bills does not affect the fact that that $1,000 a year was a provision for compensation. The defendants thus assumed to do certain things for the benefit of the plaintiff, and bound themselves for the term of five years not only to sell the plaintiff's goods, but to do all in their power to increase their sales beyond the quantities they had sold before the date of the contract. It is not to be doubted that, had the defendants refused to sell the plaintiff's goods, or had they urged purchasers to buy similar goods of a rival manufacturer in preference to those made by the plaintiff, they could have been held liable in damages for so doing. In order to perform their contract to sell to others, the defendants were compelled to buy from the plaintiff; and the contract, although silent as to specific quantities, contemplated that purchases to a very considerable amount were to be made because the allowance of $1,000 a year was to be given to the defendants by way

of a credit in monthly installments upon current bills. There was, therefore, a contract providing for a continuous business for five years, a consideration of mutual promises and mutual benefits, a clear obligation to perform an active duty resting upon the defendants, and a basis of past and current dealings on which to base an expectation of the amount of future transactions and proof of business actually done between the parties under the written contract. Although there is not an express promise to supply the defendants with goods upon their order, the correlative obligation of furnishing such goods rested upon the plaintiff in consequence of the obligation the defendants assumed "to do all in their power to increase the sale" of the plaintiff's goods. That could not be done unless the plaintiff furnished them the goods, and it is idle to claim that the contract was not made in view of reciprocal obligations of the parties to it. All the terms and purposes of the contract are to be considered, and, as it was intended to be an operative one, and as business was actually conducted under it, the necessary implication is that the plaintiff intended and contracted to deliver to the defendants all the goods they might order under it during the period of five years. But it is said that there can be no measure of damages for the breach of the plaintiff's contract. It is true, we cannot now say what the true measure of damages is, for by the course pursued by the trial justice the defendants were prevented from proving or offering to prove any damage, or from laying the foundation for the declaration of any rule. If there were not a complete breach of the contract shown, the defendants' case was prematurely closed by the ruling of the court, and they were thus prevented from making any further proof. The defendants should have been allowed to proceed with their proof, and to give further evidence, and to show what damage they sustained, if any.

The judgment should be reversed, and a new trial ordered, with costs to appellants to abide the event.

WILLIAMS, J., concurs.